**RHODE ISLAND HOSPITAL TRUST NATIONAL BANK, Appellant,**

v.

**SWARTZ, BRESENOFF, YAVNER & JACOBS, a Virginia partnership, et al., Appellees.**

No. 71-1284.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1971.

Decided Feb. 4, 1972.

William C. Worthington, Norfolk, Va. (Allan M. Shine, and Winograd, Shine & Zacks, Providence, R. I., Gerard P. Rowe, Richmond, Va., and Williams, Worrell, Kelly & Worthington, Norfolk, Va., on brief), for appellant.

William B. Eley, Norfolk, Va. (Rixey & Rixey, Norfolk, Va., on brief), for appellees.

Before WINTER and BUTZNER, Circuit Judges, and DUPREE, District Judge.

WINTER, Circuit Judge:

Rhode Island Hospital Trust National Bank ("Bank") sued Swartz, Bresenoff, Yavner & Jacobs, a firm of certified public accountants ("Accountants"), each of the partners of the firm and the estate of a deceased partner, alleging, *inter alia,* that Accountants had negligently audited the financial statements of International Trading Corporation and related companies ("Borrower") in consequence of which Bank had made loans to Borrower which was unable to repay them and Bank sustained a loss in excess of $100,000.00. The district court, sitting non-jury, concluded that the evidence failed to establish "fraud or collusion on the part of Accountants, any lack of good faith, misrepresentation, breach of duty, negligence, or failure to use reasonable care in the preparation and issuance of the financial statements," and it dismissed the complaint. We disagree with the district court's conclusions with regard to negligence. We, therefore, reverse and remand for further proceedings.

I

Borrower, an importer of cement, became a customer of Bank in 1962 when it expanded its operations to New England and opened leased pier facilities at Fall River, Massachusetts, and at Providence, Rhode Island. Borrower obtained a line of credit from Bank, to be secured by a pledge of inventories and accounts receivable, in the amount of 75% of collateral but not to exceed $200,000.-00. At approximately the same time, Borrower undertook to change its method of loading and unloading cement imports from handling in bags to handling in bulk.

This change in method necessitated a modification of facilities and the expenditure of considerable sums for leasehold improvements. In 1962 in excess of $155,000.00 was spent to improve Borrower's facilities, principally at Fort Lauderdale, Florida; and, since long-term financing was not sought, this tended to deplete working capital.

In 1963 Borrower sought long-term financing of leasehold improvements from Bank, but Bank was unwilling to lend on this basis. Bank, however, did accede to Borrower's request that the maximum amount of its line of credit be exceeded upon Borrower's assurance that economies from savings on labor costs expected to result from bulk handling would enable Borrower to operate more profitably and to meet greater loan obligations.

In June 1964 Borrower represented to Bank that during 1963 it had expended $212,000.00 for leasehold improvements to its facilities at Palm Beach, Florida, Brunswick, Georgia, and Providence, Rhode Island. The work was purportedly done by Borrower, using its own labor and materials. *In fact, the claimed 1963 leasehold improvements were totally fictitious.* The labor expenses claimed to have been incurred were incurred as operating expenses of handling and storing cement. No materials were purchased. An inspection in 1964 of all three of the facilities disclosed that they were in the same condition as they were at the end of 1962.

In accordance with the loan agreement establishing the line of credit, Borrower was obligated to furnish Bank with financial statements for each year, ending December 31; and, beginning March 27, 1964, Bank pressed to obtain the statements for the year 1963. They were not forthcoming until June 24, 1964. The income statement showed that total operating expenses, amounting to $609,-

956.42, were reduced by $212,000.00, designated "Estimated Expenses Contained in Operating Expenses Representing Cost of Leasehold Improvements," with the net effect that Borrower had a net profit after taxes of $9,257.60. The balance sheet similarly capitalized this sum on the asset side, together with other leasehold improvements, and showed a net worth of $339,427.48. If the $212,000.00 had not been capitalized, the income statement would have shown a substantial loss from operations and the balance sheet would have shown a substantial depletion of net worth (both of approximately $200,000.00).

When Accountants transmitted the financial statements to their client they wrote a covering letter expressing certain reservations about the "fairness of the accompanying statements." They stated that they had reviewed the balance sheet and profit and loss statement of Borrower and "[o]ur examination included a general review of accounting procedures and such tests of accounting records as we were permitted to make." Next, they stated that cash in banks had been verified by direct confirmations and reconciled, but that only 80.98% of the total trade accounts receivable had been confirmed. Physical inventories had been taken in Georgia, Florida and Rhode Island by correspondent accountants and various items of inventory valuation examined, with the result that the inventory as priced by management and the total of inventories as shown on the statements appeared to be correct.

The letter then discussed the crucial item concerned in this litigation—the leasehold improvements—and set forth the following:

*Additions* to fixed assets in 1963 *were found* to include principally warehouse improvements and installation of machinery and equipment in Providence, Rhode Island, Brunswick, Georgia, and Palm Beach, Florida. Practically *all of this work was done by company employees and materials and overhead was borne by the International Trading Corporation and its affiliates.* Unfortunately, fully complete detailed cost records were not kept of these capital improvements and no exact determination could be made as to the actual cost of said improvements. (emphasis added)

The total amount capitalized for leasehold improvements is as follows:

| | |
|---|---|
| International Trading Corporation of Florida | $253,465.75 |
| International Trading Corporation of Georgia | 105,181.06 |
| International Trading Corporation of New England | 79,685.16 |
| | $438,331.97 |

———◆———

Management has obtained appraisals from the following companies, *which support* the amounts set up for leasehold improvements in the warehouses:

Kendall Construction Company
West Palm Beach, Florida

A. H. Leeming and Sons of Rhode Island, Inc.
109 Waterman Street
Providence 6, Rhode Island

Copies of their appraisals are attached hereto and are part of this report.[1] (emphasis added)

---

1. While termed "appraisals" the documents attached to the letter are more correctly described as estimates of cost of construction. Specifically, there was an estimate from a general contractor to perform work at Palm Beach, Florida, and at Brunswick, Georgia, and another estimate of another general contractor to perform work at Providence, Rhode Island. The work to be performed at Palm Beach was estimated to cost $250,000.00, that at Brunswick to cost $105,000.00, and that at Providence to cost $69,144.00. The estimate for Provi-

With reference to the appraisal from A. H. Leeming and Sons of Rhode Island, Inc., this report did not include engineering services, electrical service, crane service and concrete installation forms and drilling. Management was able to identify these items from invoices recorded on its books and are submitted herewith in conjunction with said appraisal. This work *was done* in Providence, Rhode Island. (emphasis added)

Next, the letter discussed amounts invested in machinery and equipment, trade accounts payable, certain drafts payable, disputed as to amount and unconfirmed, and concluded:

Because of the limitations upon our examination expressed in the preceding paragraphs and the material nature of the items not confirmed directly by us, we are unable to express an opinion as to the fairness of the accompanying statements.

Because of the death of the partner of Accountants who made the examination of Borrower's accounts the proof was not complete as to what examination and what inquiries had been made. The deceased partner's work papers were produced and they showed that the deceased had attempted to segregate the cost of labor, which Borrower had recorded as operating expenses, attributable to the purported leasehold improvements, but the work papers showed that no item of building material cost had been recorded.

While there is uncertainty as to precisely what Accountants did in the preparation of the statements, what the Bank did after copies, together with the Accountants' letter, were delivered to it appears from a memorandum, made on the day the financial statements were received by the Bank's loan officer servicing the account, that the statements "show continued effect of the cost-cutting automation expenses initiated . . . in 1962 and completed shortly before the end of 1963." It called attention to the fact that $400,000.00 had been invested in new equipment and leasehold improvements and this investment had enabled Borrower drastically to "reduce the cost of handling cement both in unloading it from the ships and loading it into the tank trucks." The statements were referred to the analysis department of the Bank for closer study. The analysis department reported critically on the statements on September 24, 1964.

As of the date of receipt of its copies of the financial statements, Bank had lent Borrower $220,000.00. There was testimony, not disputed, that if it had known on the date that $212,000.00 of leasehold improvements were fictitious, it would have refused further loans and immediately begun efforts to effect collection of the amount outstanding. Since Bank claimed that it did not know this crucial fact, the loan balance was allowed to increase during the summer of 1964 until it reached the level of $336,685.61 on September 24, 1964, the date of the adverse report of Bank's analysis department. Thought was given to taking additional collateral, but this was not done because additional property which could be pledged was in other jurisdictions and would be impractical to service. After the analysis department reported critically on Borrower's financial statements, no further loans or commitments were made. After that date, collections were effected from collateral pledges, and they were routinely applied to the oldest loan standing on Bank's books. Total collections reduced the unpaid balance to $116,685.61, and this sum has become uncollectible.

---

dence was to do certain described items of work, and specified that it did not include silos or their foundations or any foundations under the walls which contain the cement, or any responsibility for the steel building column strength.

Also appended was a memorandum, authorship undisclosed, that various installation work for improvements at Providence, not included in the contractor's estimate, cost $8,904.69, exclusive of any labor expense of Borrower.

## II

■ The district court sat in Virginia and exercised its diversity jurisdiction. It was, therefore, bound to apply the Virginia conflict of laws rules. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Accountants' financial statements were prepared in Virginia, but they were delivered to Bank in Rhode Island where, allegedly, reliance on them and subsequent injury took place. Under such circumstances, Atlantic Coast Line R. Co. v. Withers, 192 Va. 493, 65 S.E.2d 654 (1951), teaches that the law of Rhode Island governs.

■■ As stated by the district court, the liability, if any, of Accountants for negligence is to be determined by the rule that "[a]ccountants owe a duty to their employer, and others whom they know or expect to rely on the report, to make the report in good faith without fraud or collusion and with care and caution of experts." While the Rhode Island Supreme Court has not spoken on the problem, a district court, analyzing Rhode Island decisions, concluded, in full accord with the trial court here, that "an accountant should be liable in negligence for careless financial misrepresentations relied upon by actually foreseen and limited classes of persons." Rusch Factors, Inc. v. Levin, 284 F.Supp. 85, 93 (D.R.I.1968). Since the evidence here is uncontroverted that Accountants not only knew but acknowledged that Bank sought Borrower's financial statements in connection with loans, that is the rule which will be applied.[2] In accord are Ryan v. Kanne, 170 N.W.2d 395 (Iowa, 1969); Gammel v. Ernst & Ernst, 245 Minn. 249, 72 N.W.2d 364

(1955); Restatement of Torts § 552 (1938); Restatement (Second) of Torts § 552(h) (Tent. Draft No. 12, 1966); United States v. Neustadt, 281 F.2d 596 (4 Cir. 1960); and also the English cases, Hedley Byrne & Co. v. Heller [1963] 2 All E.R. 575 (although defendant found not to have assumed responsibility for statements); and Candler v. Crane, Christman & Co. [1951] 1 All E.R. 426 (Lord Denning's dissent).

## III

■ By application of the rule stated, we think that Accountants are liable for negligence on either of alternate theories.

From the Accountants' work papers and the other evidence in the case, either of two inferences may be drawn. First, Accountants, having identified some of the purported labor costs of the purported leasehold improvements, failed, from pressure of work or other reason, to search for material costs. Second, Accountants, having identified some of the purported labor costs of the purported leasehold improvements, searched for material costs and, not finding any, failed to conduct any independent investigation of the existence of the leasehold improvements and their value[3] and failed to disclose that there was no verification that the leasehold improvements were in being. In either event, Accountants certified the financial statements, saying overall only that they could not express an opinion with regard to their fairness. This disclaimer, however, followed other reference to the purported leasehold improvements which expressed no reservation about their existence but only about their precise value. We

---

2. In arriving at this conclusion, we recognize that other jurisdictions have adopted rules establishing a more stringent test to find liability for negligence. See, e. g., Ultramares v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931), and Investment Corp. of Fla. v. Buchman, 208 So.2d 291 (Fla. Dist.Ct. of App.1968) (an accountant may be liable only to those in privity); Stephens Industries, Inc. v. Haskins, 438 F.2d 357 (10 Cir. 1971) (liability to those not in privity only upon a showing of deceit or gross negligence).

3. It should be noted that Accountants did not hesitate to employ correspondents to verify the existence of inventories. Of course, the duty to investigate may arise only where the employment contract permits, Ryan v. Kanne, supra. But if the employment contract would not permit an independent investigation, at least the lack of verification should be disclosed.

think that a fair reading of Accountants' covering letter and disclaimer indicates that while the leasehold improvements may have had a value of more or less than $212,000.00, there was no question but that they existed and that they had substantial value. Whether Accountants failed to look or, having looked, failed to find, they were guilty of actionable negligence if Bank, in reliance on the statements, made further loans.

■ Our conclusions with respect to the report and disclosure are reinforced by reference to industry standards of what should have been done in these circumstances. While industry standards may not always be the maximum test of liability, certainly they should be deemed the minimum standard by which liability should be determined. Brief references to American Institute of Certified Public Accountants, Statements on Auditing Procedure No. 33 (1963) are sufficient to prove the point.

Chapter 10 ¶ 1 of the Statements reads, "[t]he report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. *When an overall opinion cannot be expressed, the reasons therefor should be stated. . . ."* (emphasis added) When Accountants said only that "fully complete detailed cost records were not kept of these capital improvements and no exact determination could be made as to the actual cost of said improvements," we do not think that the reasons assigned were sufficiently stated. The documentary evidence shows that *no* cost records for material were kept, so that Accountants' statement, viewed even in the most charitable light, was a major understatement, whatever Accountants failed to do. Chapter 10 ¶ 9 reads "[w]hen a qualified opinion is intended by the independent auditor, the opinion paragraph of the standard shortform report should be *modified in a way* that makes clear the nature of the qualification. It should refer specifically to the subject of the qualification and *should*

*give a clear explanation of the reasons for the qualification* and of the effect on financial position and results of operations, if reasonably determinable." (emphasis supplied) Accountants failed to comply with this requirement, too, when they failed to disclose that the absence of any records for material purchases led them to resort to "appraisals." Had the absence of any records for material purchases been assigned as a reason for resort to "appraisals," Bank would have been charged with knowledge that the existence of the leasehold improvements might have been in question. The disclaimer, read in conjunction with the preceding paragraphs, conveyed the impression that the leasehold improvements unquestionably existed. Similarly, Chapter 10 ¶ 14, in dealing with disclaimer of opinion, states that when the independent auditor has not obtained sufficient competent evidentiary matter to form an opinion on the fairness of presentation of the financial statements as a whole he should state that he is unable to express an opinion on such statements. Paragraph 16 then reads, "[w]henever the independent auditor disclaims an opinion, he should give *all* substantive reasons for doing so. For example, when he disclaims an opinion because the scope of examination was inadequate, he should also disclose any reservations or exceptions he may have regarding fairness of presentation." (emphasis in original) This standard, too, Accountants failed to meet. Their disclaimer was to the effect that, because of limitations upon their examination, expressed in the covering letter, and the material nature of the items not confirmed by them, they could not express an opinion as to the fairness of the accompanying statements. They failed to state that they either did not look for or could not find evidence of material costs for the purported leasehold improvements, and either would have been more than a simple limitation upon their examination.

■ The district court failed to make a finding as to whether or not Bank

relied upon the financial statements in making loans up to September 24, 1964, when the analysis department completed a report critical of the financial statements, and in forebearing from the collection of outstanding indebtedness. There was testimony and documentary evidence that it did, as well as evidence that after the report was prepared, no additional loans were made, although there were subsequently set up on the books as loans, trade acceptances and letters of credit on which Bank had theretofore committed itself, and renewal notes. There was also evidence, however, that, at least arguably, Bank did not rely on the financial statements in making loans after their receipt and in failing to collect outstanding loans. Manifestly, it is the district court, and not us, which should make the requisite finding. Of course, if reliance is found the district court should proceed to assess damages.

Reversed and remanded.