**RHODE ISLAND HOSPITAL TRUST NATIONAL BANK, Appellant,**

v.

**SWARTZ, BRESENOFF, YAVNER & JACOBS, a Virginia partnership, et al., Appellees.**

**No. 71-1284.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1973.

Decided Aug. 1, 1973.

William C. Worthington, Norfolk, Va., (Allan. M. Shine, Winograd, Shine & Zacks, Providence, R. I., James L. Miller, Gerard P. Rowe and Williams, Worrell, Kelly & Worthington, Norfolk, Va., on brief), for appellant.

William B. Eley, Norfolk, Va., (Rixey & Rixey, Norfolk, Va., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, WINTER, Circuit Judge, and MURRAY, District Judge.

HAYNSWORTH, Chief Judge:

Rhode Island Hospital National Bank sued Swartz, Bresenoff, Yavner & Jacobs, a firm of certified public accountants, each of the partners of the firm and the estate of a deceased partner, alleging, *inter alia*, that the accountants had negligently audited the financial statements of International Trading Corp. and related companies in consequence of which the bank had made loans to International which was unable to repay them, and the bank sustained a loss. The District Court, sitting without a jury, concluded that the evidence failed to establish "fraud or collusion on the part of Accountants, any lack of good faith, misrepresentation, breach of duty, negligence, or failure to use reasonable care in the preparation and issuance of the financial statements," and it dismissed the complaint. We disagreed with the District Court's conclusions with regard to negligence in our first consideration of this matter. We, therefore, reversed and remanded the action to the District Court to determine if the bank had relied on the accountants' negligent misrepresentations. Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs, 4 Cir., 455 F.2d 847.

On remand, no new evidence was presented, and after reconsidering the issue, the District Court found no reliance by the bank and therefore no right of recovery. The District Court did go on to consider the question of damages, in the event we should later find there was reliance. We do find reliance, and direct the entry of judgment for the plaintiff for damages in the amount found by the District Court.

International, an importer of cement, became a customer of the bank in 1962 when it expanded its operations to New England. It obtained a line of credit from the bank to be secured by a pledge of inventories and accounts receivable, in the amount of 75% of collateral but not to exceed $200,000. At approximately the same time, International undertook to change its method of handling cement from bags to bulk in order to reduce labor costs and achieve more profitable operations.

This change necessitated modification of facilities and the expenditure of considerable sums for leasehold improvements. In 1962 more than $155,000 was so spent, primarily on its Florida facilities. Such expenditures naturally tended to deplete International's working capital. Although the bank had made a number of loans to it during the year, by the end of 1962 there were no outstanding obligations to the bank.

In 1963 International sought long-term financing of leasehold improve-

ments from the bank, but the bank was unwilling to lend on that basis. The bank, however, did accede to International's request that the maximum amount of its line of credit be exceeded upon International's assurance that economies from savings on labor costs, expected to result from bulk handling, would enable it to operate more profitably and to meet greater loan obligations.

In June 1964 International represented to the bank that during 1963 it had expended $212,000 for leasehold improvements to facilities in Florida, Georgia and Rhode Island. The work was purportedly done by International, using its own labor and materials. In fact, the claimed 1963 leasehold improvements were totally fictitious. The labor expenses claimed to have been incurred were incurred as operating expenses in handling and storing cement. No materials were purchased. An inspection of these facilities in 1964 disclosed that they were in the same condition as at the end of 1962.

In accordance with their loan arrangement, International was obligated to furnish the bank with financial statements for each year, ending December 31. Beginning March 27, 1964, the bank pressed to obtain the statements for 1963. They were not forthcoming until June 24, 1964.[1] The income statement showed that the total operating expenses, amounting to $609,956.42, were reduced by $212,000 designated "Estimated Expenses Contained in Operating Expenses Representing Cost of Leasehold Improvements," with the net effect that International had a net operating profit of $1,654.17. There was other income, and the statement showed a profit of $12,741.89 and a net profit after taxes of $9,257.60. The balance sheet similarly capitalized the $212,000 on the asset side, and showed a net worth of

$339,427.28. If the $212,000 had not been capitalized, the income statement would have shown a loss from operations of over $210,000 and the balance sheet would have shown a net worth of only $131,000.

When the accountants transmitted the financial statements to their client, they wrote a cover letter expressing certain reservations about the "fairness of the accompanying statements." With respect to the critical item, the 1963 leasehold improvements, however, the accountants' qualification was only to the effect that since "fully complete detailed cost records were not kept * * * no exact determination could be made as to the actual cost of said improvements." The accountants made no suggestion that the improvements were nonexistent or insubstantial.

While there is uncertainty as to precisely what the accountants did in the preparation of the statements, what the bank did after copies, together with the accountants' letter, were delivered to it appears from a memorandum, made on the day the statements were received by Peter Toulmin, the bank's loan officer. Toulmin recorded that the statements "show continued effect of the cost-cutting automation expenses initiated * * * in 1962 and completed shortly before the end of 1963." His memo called attention to his belief that altogether approximately $400,000 had been invested in new equipment and leasehold improvements and that this investment had enabled International to drastically "reduce the cost of handling cement both in unloading it from the ships and loading it into the tank trucks."

After Toulmin finished briefly looking over them, he referred the statements to the credit analysis department of the bank for detailed study. On September 24, 1964, the analysis department reported critically on the statements.

1. Maury Spencer, International's chief stockholder and president, delivered the statements to Peter Toulmin, the bank's loan officer in charge of International's account. Spencer remained while Toul-min briefly looked over the statements. Spencer said nothing to warn Toulmin that the 1963 improvements had not been made.

As of the date of receipt of the copies of the financial statements, June 24, 1964, International's total obligations to the bank were approximately $220,000. Toulmin testified that if he had known on that date that $212,000. of International's leasehold improvements were fictitious, no further credit would have been extended. Toulmin stated that had the truth been known the account would probably have been immediately assigned to the bank's classified loan department for strenuous efforts to collect it. Since he was unaware of these crucial facts, International's loan balance was allowed to increase during the summer of 1964 until it reached $336,685.-61 [2] on September 24, 1964, the date of the analysis department's adverse report.

After the analysis department reported critically on International's financial statements, the bank made no new commitments. Instead, collections were effected from collateral pledges and were routinely applied to International's oldest loan standing on the bank's books. Total collections reduced the unpaid balance to $116,685.61, and this sum has become uncollectible.

In its first opinion, the District Court found that the accountants had broken no duty in their audit and preparation of the financial statements and therefore denied relief. We rejected this conclusion and found that the accountants had been negligent. We then remanded the action to the District Court to determine if the bank had relied on the erroneous reports. The District Court concluded that the bank had not.

We find this ruling to be clearly erroneous. We accept, however, that alternative portion of the District Court's opinion fixing damages in the amount of $67,217.50,[3] plus six per cent interest from January 14, 1971 (the date of the District Court's first opinion).

The issue before us is a narrow one: was the District Court clearly in error in finding that the bank did not rely on the financial statements in extending credit to International from June 24, 1964, to September 24, 1964?

We have already held that the accountants were negligent in conducting their audit and preparing the statements. We determined before that the accountants' disclaimer was insufficient to preclude a finding of negligence. Similarly, it fell short of adequately alerting the bank to International's financial ills so grave as to amount to a collapse. It is true that Toulmin was familiar with the difference between a qualified and an unqualified financial report and one with a disclaimer. A fair reading of the accountants' cover letter and disclaimer indicates, however, that the disclaimer went only to the precise amount which had been expended on leasehold improvements. The statements were a clear representation that, while the leasehold improvements may have had a value of more or less than $212,000 a substantial sum had been

2. The exact amount of International's obligation to the bank on September 24, 1964, has been a subject of some controversy. Both Michael Rhee, a member of the bank's classified loan department, and Toulmin testified that the figure of $336,-685.61 was correct (although Toulmin did give a different figure at one point). Mr. Iselin of the credit analysis department put the amount at $246,685.61 with another $90,000 in unmatured acceptances in the bank's international department (half maturing on October 5, 1964, and the remainder on November 23, 1964). Iselin's *total* would also be $336,685.61.

3. The District Court arrived at this figure by starting with undisputed increased liabilities of $27,217.50 from June 24, 1964, to September 24, 1964. As mentioned in note 2, there was also an additional $90,-000 on the books committed to International. This sum was to be advanced in two increments of $45,000 each, one on October 5, 1964, and the other on November 23, 1964. The District Court could find no evidence of any loan, payment or advance of $90,000 or any of $45,000 or any combination of advances showing $90,000. There was, however, an advance of *$40,000* on *October 5, 1964*. The District Court assumed this sum was advanced as part of the $45,000 acceptance due on that date and concluded that it should be included in the damages due the bank.

spent upon them during the year and they had substantial value.[4]

The District Court reasoned that since the bank's loans to International were secured by a pledge of inventories and accounts receivable (which were not falsely represented), any reliance on misrepresented improvements was immaterial. Such a conclusion overlooks the realities of the situation. The bank's sole reason for allowing International to borrow beyond the established maximum credit was its belief that International was using most of its operating capital to make leasehold improvements. It was believed that these improvements would significantly increase the efficiency of International's cement handling operations and thereby produce greater profits in the near future.[5] The bank would have hardly continued to extend credit to International if the 1963 financial statements had accurately pictured its financial situation. Instead, the bank would have done as Toulmin testified—frozen the account and attempted immediate collection.

The accountants have suggested that the circumstances surrounding the bank's dealings with International were such that the bank was already convinced of the existence of the fictitious improvements prior to receiving the 1963 financial statements.[6] It is true that, prior to receiving the statements, the bank had no reason to question the existence of the improvements it had been told had been wrought in 1963. But it was due to the accountants' negligence that the bank had no reason to question their existence after receiving the statements. Had the bank been advised of International's actual position, the disastrous operating losses in 1963 and the tremendous shrinkage in net worth, it is obvious that the bank would not have acted as it did. This amounts to a clear showing of reliance by the bank. It is immaterial that preceding circumstances caused the bank to be more receptive to the false information.[7]

It can hardly be gainsaid that if the accountants had not misrepresented the expenditure of substantial sums on leasehold improvements and had disclosed the calamitous losses, one of two things would have happened. International might have withheld the statements from the bank, but by late June surely the time was close when the bank

4. Accountants had included a similar disclaimer in International's *1962* financial report—1962 was the year in which International actually had made substantial leasehold improvements.

5. Toulmin stated that at the time he received the financial statements he felt that the corporation was making progress, that they had been initiating cost-cutting improvements, which would show up in higher profits in the future, and that the loan, while under margin * * * would—once the corporation rounded the corner, as indicated by these improvements, would begin to pay down.

6. International had made substantial improvements in 1962 which certainly led the bank to believe that the alleged continuing improvements of 1963 were also made. In February of 1963, Toulmin, himself, saw some of International's improvements, evidently made in 1962. Also, in January of 1964, Toulmin received a telephone call from a Florida banker regarding the nature of the improvements made there by International "last year" (this statement could have referred to 1962 or 1963). Finally, there was the presence of Spencer when he gave the statements to Toulmin in June of 1964. Toulmin surely talked with Spencer to some extent about International's new operations, but Spencer did not disclose the fact that portions of the reports were erroneous. There was no reason for Toulmin to suspect this was the case and closely question Spencer on the subject.

7. [I]t is not required that the defendant shall have been the sole cause of the damage; and indeed it is seldom, if ever, that the plaintiff is not influenced to some extent by many other factors, most of which are not connected with the defendant at all. It is enough that the representation has had a material influence upon the plaintiff's conduct, and been a substantial factor in bringing about his action.
W. Prosser, Handbook of the Law of Torts ch. 20 § 103 (3d ed. 1964).

would stop all fresh credit because of its failure to receive the statements it had been seeking since late March. If copies of a true statement had been furnished the bank, it is obvious that disclosed financial reverses would have deprived it of fresh credit. Either way, International could not have continued to receive fresh credit without the aid of the accountants' false statement.

The fact that the bank did not sever all financial relations with International after Toulmin had received the critical analysis from his analysis department does not mean that the bank did not rely on the accountants' statements. The analysis, while strongly criticizing International's fiscal condition, did not disclose that the 1963 improvements had never been made.

We are thus led to but one conclusion. The bank clearly did rely on the accountants' audit and preparation of the financial statements to its detriment. This coupled with the accountants' negligence gives the bank a cause of action. We, therefore, reverse the District Court's judgment and direct the entry of a judgment for the bank for damages in the amount determined by the District Court.

Reversed.