BUNGE CORPORATION, Plaintiff,

v.

Oliver A. EIDE et al., Defendants.

Civ. No. 4636.

United States District Court,
D. North Dakota.

March 29, 1974.

Robert Vaaler, Stokes, Vaaler, Gillig, Warcup & Woutat, Grand Forks, N. D., for plaintiff.

Clyde F. Anderson, Meagher, Geer, Markham & Anderson, Minneapolis, Minn., Garry A. Pearson, Grand Forks, N. D., for defendants.

## MEMORANDUM OF DECISION

BENSON, Chief Judge.

### STATEMENT OF THE CASE

In this diversity action, the plaintiff has sued its debtor's accountants seeking recovery for $1,500,000.00 in losses it alleged it sustained when on August 25, 1970, the debtor was adjudicated a bankrupt. Plaintiff alleges that defendants, in the years 1963 through 1968 inclusive, were employed by plaintiff's debtor to prepare financial statements, reports, and audits relating to debtor's business operations which statements, reports and audits were relied upon by the plaintiff in extending credit to its debtor. It alleges that defendants were negligent in the preparation of the financial statements, reports and audits, particularly in the pricing of sunflower seed inventories, for the years in question, and that the reports and audits did not fairly present the financial condition of the debtor as of the date of the reports. The case was bifurcated, and the issue of liability was tried to the Court without a jury.

### FINDINGS OF FACT

Plaintiff (Bunge) is a New York corporation engaged in the merchandising of grain, with offices in many of the principal cities in the grain producing areas and shipping ports of the United States.

Defendants are a North Dakota partnership of Certified Public Accountants, with their principal office in Fargo, North Dakota.

Bunge, through its Minneapolis, Minnesota, regional office, financed country elevators in the States of Minnesota,

North Dakota, and South Dakota, by permitting the financed accounts to draw drafts on Bunge for purchasing grain from producers, and to otherwise finance their operations. As security, Bunge took shippers contracts and Uniform Commercial Code security agreements. Prior to the adoption of the Uniform Commercial Code, they took mortgages. The object of the shippers contract was to obligate the financed account to sell its grain through Bunge. Bunge received a commission on the grain it handled as agent and interest on its money. It also bought and sold grain outright for its own account.

One of Bunge's financed accounts was R. F. Gunkelman and Sons, Inc. (Gunkelman), Fargo, North Dakota. Gunkelman was a closely held corporation affiliated with Gunkelman Realty Co. and Diamond G Products, Inc. The six stockholder-officers had a controlling interest in Gunkelman, Gunkelman Realty Co., and Diamond G Products, Inc. Gunkelman Realty Co. was a holding company for the real estate and buildings used by Gunkelman, and Gunkelman paid rent to Gunkelman Realty Co. Diamond G Products, Inc., was a feed company. Gunkelman was engaged in grain marketing, seeds, chemicals, fertilizer and other activities related to the production and sale of grain and agricultural commodities.

The credit extended to Gunkelman by Bunge was many times larger than that extended to any of the other financed accounts, and the account was considered to be unique. The account was supervised out of the Minneapolis regional office by Bunge's credit manager and a field man who traveled the territory. A friendly business and social relationship developed between the Gunkelman officers and Bunge's credit manager. By April 1, 1967, when a change in credit managers took place by reason of the retirement of the credit manager who had served in the position for about eight years, the Gunkelman indebtedness to Bunge had risen to $1,674,668.86, plus $800,000.00 which had been transferred to Gunkelman Realty Co. and Diamond G Products, Inc. The $800,000.00 was secured by real estate mortgages on real estate owned by the two affiliated corporations.

The Gunkelman account was maintained as an open account, without stated limits and without security of any kind. The shippers contracts and the security agreements which Bunge required on its financed accounts had never been obtained from Gunkelman. There were no cross guarantees from the affiliated corporations, and no personal guarantees from the stockholder-officers. There were no controls of any kind on Gunkelman's management. There was no substantial seasonal reduction of the account.

Over a period of years preceding 1963 and continuing until Gunkelman was adjudicated bankrupt in 1970, defendants were employed to audit Gunkelman's operations and prepare financial statements and audit reports. The certified audits which had been prepared by the defendants, copies of which the defendants "assumed" were to be furnished to the plaintiff, and which were in fact furnished to the plaintiff, disclosed Gunkelman's profits for the years 1963 through 1968 inclusive to be:

| | |
|---|---|
| June 30, 1963 | $ 30,695.67 |
| June 30, 1964 | $ 25,923.18 |
| June 30, 1965 | $ 25,851.51 |
| June 30, 1966 | ($ 33,234.95) Loss |
| June 30, 1967 | $ 13,825.00 |
| June 30, 1968 | $ 37,854.00 |

When Bunge expressed concern about the small profit shown relative to the amount of credit extended, Gunkelman's "patent" answer, accepted by the plaintiff, was "that it was to avoid taxes". The Bunge financing was used by Gunkelman, with Bunge's knowledge, for purchasing commodities not handled by Bunge, principally sunflower seeds. It was also used for capital improvements.

Prior to the change of credit managers in April, 1967, Bunge began to show concern with the status of all its fi-

nanced accounts out of its Minneapolis regional office, and particularly the Gunkelman account. This concern resulted in the development of a new credit policy wherein accounts were classified as conforming and non-conforming. Sixty-nine accounts were classified as conforming, and fifty-three as non-conforming.

The credit policy established required that a ceiling of seven or eight times the income derived by Bunge from the accounts be placed on each of the accounts. It also required that an absolute ceiling be placed on each account, not to exceed the quick sale value of not easily removable chattels mortgaged to Bunge by properly drawn and filed security agreements and financing statements. This requirement limited the chattels acceptable as security to elevators, annex buildings, hard to remove machinery, and eliminated livestock, merchandise, portable machinery, office equipment, motor vehicles, and inventories and receivables except where they may be allowed for reasons which to Bunge appeared valid. In addition, accounts were required to have a current asset to current liability ratio of 1.25 to 1.00, and a minimum net worth of $25,000.00. Quarterly reports were required from the non-conforming accounts.

Bunge failed in its efforts to get the Gunkelman account under control. The indebtedness rose to $3,153,000.00 at the end of April, 1969. Bunge thereafter asserted increased pressure on the account, but its efforts to get security agreements, financing statements, cross guarantees from affiliated corporations, personal guarantees from the stockholder-officers, and quarterly reports, were only partially successful. In November, 1969, stock pledges were secured from the officer-stockholders, but no personal guarantees were ever obtained.

A security agreement was obtained in the summer of 1969 and foreclosed in July, 1970, after which Gunkelman was adjudicated a bankrupt in August, 1970, all resulting in a shortfall to Bunge which they allege to be $1,500,000.00.

The American Institute of Certified Public Accountants has established standards and guidelines to be followed by the accounting profession, including Statement No. 9 of Accounting Research Bulletin No. 43, which provides:

> "Only in exceptional cases may inventories properly be stated above cost. For example, precious metals having a fixed inventory value with no substantial cost of marketing may be stated at such inventory value; any other exceptions must be justifiable by inability to determine appropriate approximate costs, immediate marketability at quoted market price, and the characteristic of unit interchangeability. Where goods are stated above cost, this fact should be fully disclosed."

In the years 1963 through 1968 inclusive, Gunkelman did a major business in sunflower seeds on which there was no quoted market. In their audit reports, defendants included unprocessed sunflower inventories under grain and valued them at local market. Bunge knew that sunflowers were included in the grain inventories and knew they were valued at local market.

Defendants declined to certify their Gunkelman audit for the period ended June 30, 1969, for the following reason stated in the audit report for that period:

> "Because of inadequate inventory procedures we were unable to substantiate the correctness of inventory quantity, quality and price. Because inventories enter materially into the determination of financial position and results of operations, we express no opinion on the accompanying financial statements."

In a note accompanying the financial statements for the period ending June 30, 1969, defendants stated:

> "It has been the practice in prior years to value unprocessed sunflower inventories at cost plus a 'market escalation'. Inasmuch as there is not a ready market quotation available for

unprocessed sunflowers as there is in the case of grain, the company has changed their method of valuation of unprocessed sunflower from an approximate market value to cost. Had this method of valuation been used in the preceding year, the net loss for the current year would have been $149,536.00."

The term "market escalation" is not an accounting term and has no generally accepted meaning in the accounting profession. The term was supplied by Gunkelman, and in effect, meant local market. Inventories and inventory valuations were supplied to the defendants by Gunkelman. The inventories were audited by inspection, counting, and by probing bulk and bag inventory. Valuations of grain quoted on the organized market were audited by checking market quotations. Prior to 1969, valuations of unprocessed sunflower inventories were audited by examining Gunkelman's sales invoices for the months of June, July, and the early part of August each year; June 30 being the end of Gunkelman's fiscal year. Futures contracts when available were also examined. In 1969, unprocessed sunflower valuation was changed to cost, which included storage and handling charges.

Defendants declined to certify the financial statements for the period ending June 30, 1969, because the audit disclosed error in quantities and prices listed by Gunkelman, all of which errors were "one way" and which overstated quantities and values. Defendants' method of stating unprocessed sunflower inventories at local market was not in accordance with generally accepted accounting principles. In all other respects, the financial statements and reports and auditing procedures were in accordance with generally accepted auditing procedures. There is no evidence that the sunflower inventories were sold for less than the stated valuations, and there is no evidence that the defendants' financial statements and audit reports on Gunkelman did not fairly reflect the financial condition of the company for the period covered by the reports.

From the foregoing facts, the Court concludes the defendants did not materially misrepresent the financial condition of R. F. Gunkelman and Sons, and in extending credit, plaintiff's reliance was on Gunkelman principals and not on the reports of its accountants.

## RATIONALE

The parties tried the case on the theory that negligence was the applicable standard. The plaintiff expressed it as:

"We rely for our right to recover . . . on the theory that an accounting firm is liable in negligence for careless financial misrepresentation contained in audit reports prepared and certified by an actually foreseen and limited class of persons." citing Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs, 455 F.2d 847 (2nd Cir. 1972); Rusch Factors, Inc. v. Levin, 284 F.Supp. 85 (D.R.I.1968); Ryan v. Kanne, 170 N.W.2d 395 (Iowa 1968); Gammel v. Ernst & Ernst, 245 Minn. 249, 72 N.W.2d 364 (1955).

There are no North Dakota decisions concerning an accountant's duty toward third persons who rely upon their routine audit reports, and this Court is not persuaded that the North Dakota Supreme Court would adopt negligence as a standard in third party cases except in those cases where an audit was undertaken for the specific purpose of concluding a transaction wherein the auditor knew that the third party was relying on the audit, and the audit was for the primary benefit of the third party.

Until recently, the universal rule has been that fraud is the only basis of recovery in third party cases. In dealing with the scope of the accountant's duty, Judge Cardozo in Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139 (1931), stated:

"if liability for negligence exists, a thoughtless slip or blunder, the failure

to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes [accountants] to these consequences." 255 N.Y. at 179, 174 N.E. at 444, 74 A.L.R. at 1145.

46 A.L.R. Liability of Public Accountants to Third Parties, § 2(a) states:

"Courts have traditionally refused to impose negligence liability on the ground of the potentially crushing burden which would be placed on the profession by liability 'in an indeterminate amount to an indeterminate class for an indeterminate length of time.' "

No duty existed, judicially, towards creditors or investors, who were strangers, using the word broadly, to the negligent accountants. This principle continues to be followed in some current decisions. Stephens Industries, Inc. v. Haskins & Sells, 438 F.2d 357 (10th Cir. 1971); Investment Corp. of Florida v. Buchanan, 208 So.2d 291 (Fla.App. 1968); Canaveral Capital Corp. v. Bruce, 214 So.2d 505 (Fla.App.1968). The decision in Stephens Industries is germane to the case at bar. In that case, the plaintiff agreed to purchase the stock of two rent-a-car companies, subject to an audit of Haskins and Sells to determine the net value for each corporation. It was alleged that the accountants misrepresented the status of the accounts receivable in the audit which caused plaintiff to overpay. Haskins and Sells were aware of the purpose of the audit, and were present at the closing of the stock purchase deal. Instructions were given to the jury, "that under the generally accepted rule articulated in Ultramares . . ., third parties not in privity must prove fraud or misrepresentation as a predicate to recovery". 438 F.2d at 359. On appeal, appellants urged that "where third parties are known to be relying on the public accountant's work product, the latter should be liable for mere negligence". 438 F.2d at 359.

Noting that it was a diversity case, it followed that, "where, as here, there are no state court decisions on the issue, absent clear error we must defer to the trial court's judgment as to what the state courts would decide if confronted with the questions". 438 F.2d at 359. The court relied upon the "predominating rule" of Ultramares in upholding the trial court's determination and rejected the cases showing the modern trend (same cases cited by plaintiff herein):

"The burden on appellants to prove clear error, as referred to above, is a heavy one. While success in a case such as this does not necessarily depend on proving that a preponderance of jurisdictions support appellants' view of the law, there must be substantial evidence showing that Colorado would align itself with the developing trend. In that sense, appellants have failed to persuade us. Of the three cases cited, only the Ryan case can fairly be said to unequivocally represent a state's adoption of the rule propounded. The Rusch Factors case was an instance of a federal court speculating as to what the state courts would do with the issue, and the Gammel case presents other deficiencies heretofore mentioned. Moreover, the argument is devoid of substantive evidence necessary to convince this court that Colorado would part company with the rule applied by the trial court. . . ." 438 F.2d at 360.

While under the facts of the case before this Court it is not necessary for the Court to try and determine how the North Dakota court would hold, it is interesting to note the 1966 tentative draft of the Restatement appears to be a compromise between Ultramares and an allowance of recovery to third persons under the common law theory of negligence.

"(1) One who, in the course of his business, profession, or employment, or in a transaction in which he has a

pecuniary interest, supplies false information for the guidance of others in their business transaction, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) . . . (t)he liability stated in subsection (1) is limited to loss suffered

    (a) by the person or one of the persons for whose benefit any guidance he intends to supply the information, or knows the recipient intends to supply it; and

    (b) through reliance upon it in a transaction which he intends the information to influence, or knows that the recipient so intends, or in a substantially similar transaction." RESTATEMENT TORTS 2d § 552 (Tent. Draft No. 12, 1966)

This Restatement expression, which in this court's view is the better rule, recognizes the fear expressed in *Ultramares* of imposing liability upon accountants to third persons under a theory of negligence, but nevertheless applies a limited form of negligence in some accountant-third party cases. Restatement Torts 2d § 552 (Tent. Draft No. 12, 1966) has been cited as authority by many of the cases relied upon by plaintiff including Rhode Island Hospital Trust National Bank v. Swartz, Bresenoff, Yavner & Jacobs, 455 F.2d 847 (4th Cir. 1972); Rusch. Factors, Inc. v. Levin, 284 F. Supp. 85 (D.R.I.1968); and Ryan v. Kanne, 170 N.W.2d 395 (Iowa 1968). In any event, plaintiff has failed to prove its case under the Restatement view or under a common law theory of negligence.

Plaintiff herein initially based its claim on three alleged violations of certain standards and principles promulgated by the American Institute of Certified Public Accountants, two of which were not supported by the evidence and appear to have been abandoned by the plaintiff in its post-trial brief. The third related to the requirements of Statement 9 of Accounting Research Bulletin No. 43. Specifically, the plaintiff contended that defendant in its audit reports from 1963 to 1968, valued sunflower seeds in the closing inventory at something more than cost in contravention of Statement 9, and as such, materially overstated net profits for those years. It is contended that Bunge placed great reliance on these audit reports in extending credit to Gunkelman.

Defendants, through the years in question, 1963 through 1968, consistently used the same method for arriving at a valuation for the unprocessed sunflower. Thus the value of the closing inventories from one year's report were the value of the beginning inventories of the succeeding year. There is no evidence that this resulted in a distortion in the reports of the financial condition of the company, and one must conclude that it probably did not over the six year period, because where the method was used consistently an overstatement one year would likely result in an understatement the following year. Plaintiff would argue that this does not necessarily follow because the volume of sunflower seeds handled steadily increased each year. This is of no help to the plaintiff because there is no evidence that the value of the sunflowers as stated on the audit was not realized on the subsequent sales of the inventories. Even if the method used did overstate the value, the plaintiff's contention that it relied on those values and was misled to its detriment is not credible because the evidence conclusively established that it was fully aware that the value of unprocessed sunflowers was stated in the reports at local market. Bunge's attempt to draw a distinction between local market and "market escalation" is not persuasive. Defendant tested the "market escalation" values furnished by Gunkelman against local market as determined from sales inventories. One must therefore conclude that "market escalation" was local market as actually designated in the reports.

It was clearly established that the Gunkelman account went out of control by reason of Bunge's loose credit policy

that existed prior to 1967. Thereafter, efforts to bring it under control were not successful. Its credit manager explained the continued extension of credit as having been required because if they had stopped "we would have put the business in jeopardy and Bunge would have suffered a loss." The credit manager also testified "to force them would put them out of business".

Bunge obviously did suffer a loss, but that loss was not the proximate result of any negligence of the defendants. It would seem to this Court that the objectives of the standards and guidelines of the American Institute of Certified Public Accountants is to correctly state the financial condition of a company. There is no proof that the defendants' reports failed to correctly state the financial condition of R. F. Gunkelman and Sons, Inc. There is much evidence that Bunge closed its eyes to the information disclosed by those reports and continued to extend credit without any of the normal controls and security that a prudent creditor usually requires.

It is ordered that judgment be entered for the dismissal of the plaintiff's complaint.