Olga **HOCHFELDER** et al., Plaintiffs-
Appellants,

v.

**ERNST & ERNST**, Defendant-
Appellee.

Leon S. **MARTIN** et al., Defendants-
Appellants,

v.

**ERNST & ERNST**, Defendant-
Appellee.

**Nos. 73–1907, 73–1908.**

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1974.

Decided Aug. 30, 1974.

Rehearing Denied Nov. 22, 1974.

Alex Elson, Donald L. Vetter, Willard L. King, Chicago, Ill., for plaintiffs-appellants.

Francis D. Morrissey, Chicago, Ill., for defendant-appellee.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SWYGERT, Chief Judge.

Plaintiffs appeal from a grant of summary judgment in favor of the defendant Ernst & Ernst, a firm of independent certified public accountants. The plaintiffs were investors[1] in a fraudulent securities scheme perpetuated by Leston B. Nay, President of First Securities Company of Chicago and owner of ninety-two percent of its stock. First Securities was a small brokerage firm in Chicago which was registered with the Securities and Exchange Commission as a broker-dealer in securities and was a member of the Midwest Stock Exchange as well as the National Association of Securities Dealers, Inc. First Securities retained Ernst & Ernst as auditors' beginning in 1946 and continued to engage its services up through the last audit of First Securities performed in November, 1967.

The instant action emanates from Leston B. Nay's fraudulent securities scheme which we have described in detail in our opinion in Securities & Exchange Com'n v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972), and which needs only be briefly recounted here. The plaintiffs were brokerage clients of First Securities, dealing in securities through First Securities in regular fashion. Each plaintiff received investment counselling from Nay, and each knew Nay to be the president of First Securities. Nay induced the plaintiffs to invest funds in an "escrow" account which Nay represented would yield interest to plaintiffs at a high rate of return. Plaintiffs began to invest in the escrow accounts as early as 1942 with the majority of the transactions entered into in the 1950's and the last of the escrow transactions consummated in 1966. It was not until 1968 that Nay's fraudulent scheme was discovered as a result of a suicide note left by Nay describing First Securities as bankrupt due to his thefts and indicating that certain escrow accounts created by him were "spurious." Plaintiffs had invested in the "spurious" escrow accounts. As a result of his actions, we held in Se-

---

1. The plaintiffs in Appeal No. 73–1907, Olga Hochfelder, et al., filed an action on February 19, 1971 in district court against the Midwest Stock Exchange and Ernst & Ernst. On May 18, 1971 a separate but identical complaint was filed by plaintiffs Leon S. Martin, et al., in Appeal No. 73–1908. Midwest and Ernst & Ernst filed motions for summary judgment applicable to both cases. The district court granted summary judgment in favor of the Midwest Stock Exchange which we affirmed in the consolidated appeal. Hochfelder, et al. and Leon S. Martin, et al. v. Midwest Stock Exchange, 503 F.2d 364 (7 Cir. 1974). Subsequent to the grant of summary judgment to Midwest, the district court granted summary judgment in favor of Ernst & Ernst. The appeals were consolidated by stipulation of the parties and our order of November 13, 1973.

curities & Exchange Com'n. v. First Securities Co. of Chicago, 463 F.2d 981, 986 (7th Cir. 1972), that "Nay's conduct violated the provisions of section 10(b) of the Securities Exchange Act of 1934 and its regulatory corollary, Rule 10b–5," and that First Securities was chargeable with Nay's fraud as an aider and abettor to Nay's Rule 10b–5 violation.

In the instant action the plaintiffs claim that Ernst & Ernst was negligent in auditing First Securities thereby aiding and abetting Nay's Rule 10b–5 violation. It is contended that had Ernst & Ernst duly executed its audit of First Securities Nay's fraudulent scheme would have been uncovered or prevented.

In resolving this appeal we must address the following matters: (1) the elements of a *prima facie* case for aiding and abetting must be properly defined; (2) the propriety of the district court's ruling that the evidence presented no genuine issue of material fact as to the adequacy of Ernst & Ernst's audits of First Securities under applicable auditing standards; (3) whether the district court correctly ruled that plaintiffs' claims against Ernst & Ernst are estopped by their conduct prior to the presentment of such claims; and (4) whether the district court properly held that plaintiffs' claims against Ernst & Ernst are barred by the applicable statute of limitations.

In granting summary judgment for Ernst & Ernst the district judge found that there were no genuine issues of material fact and held that on the basis of the uncontroverted evidence Ernst & Ernst was entitled to judgment as a matter of law. But it is our view there are genuine issues of material fact in dispute which go to the very question of liability. We hold, therefore, that this was not an appropriate case for summary judgment and accordingly reverse and remand for trial.

## I

■■ Ernst & Ernst contends that as a matter of law, it cannot be held liable for aiding and abetting Nay's fraud in view of the fact that admittedly it had no knowledge of Nay's fraudulent escrow scheme. We have indirectly passed upon this contention in our recent decision in Hochfelder, et al. and Martin, et al. v. Midwest Stock Exchange, 503 F.2d 364 (1974) where we stated that a claim for aiding and abetting solely by inaction can be maintained under Rule 10b–5 by a showing:

"that the party charged with aiding and abetting had knowledge of or, but for a breach of duty of inquiry, should have had knowledge of the fraud, and that possessing such knowledge the party failed to act due to an improper motive or breach of a duty of disclosure."

The foregoing elements comprise a flexible standard of liability which should be amplified according to the peculiarities of each case. Accordingly, where, as here, it is urged that the defendant through action as well as inaction has facilitated the fraud of another, a claim for aiding and abetting is made on demonstrating: (1) that the defendant had a duty of inquiry; (2) the plaintiff was a beneficiary of that duty of inquiry; (3) the defendant breached the duty of inquiry; (4) concomitant with the breach of duty of inquiry the defendant breached a duty of disclosure; and (5) there is a causal connection between the breach of duty of inquiry and disclosure and the facilitation of the underlying fraud; that is, adequate inquiry and subsequent disclosure would have led to the discovery of the underlying fraud or its prevention. As our analysis will demonstrate, plaintiffs state a claim of aiding and abetting a Rule 10b–5 violation under the foregoing elements.

## II

■ With respect to the existence of a duty of inquiry it is clear that Ernst & Ernst's contractual arranagement whereby it undertook to audit First Securities gave rise to a common law duty of inquiry. The extent and scope of that duty will be the subject of addition-

al analysis; for present purposes, however, it is sufficient to state that Ernst & Ernst's audit engagement imposed a common law duty of inquiry.

In addition, having undertaken the contractual duty to audit First Securities and prepare SEC Form X–17A–5 pursuant to section 17(a) of the Securities Exchange Act and SEC Rule 17a–5 thereunder,[2] a statutory duty of inquiry is properly imposed on Ernst & Ernst. Section 17(a) and its corollary Rule 17a–5 require a member of a national securities exchange to file with the SEC an annual report of financial condition certified by an independent certified public accountant, which report meets the requirements of Form X–17A–5. In accordance with the provisions of section 17(a) and Rule 17a–5 First Securities retained Ernst & Ernst. Thus, we find Ernst & Ernst chargeable additionally with a statutory duty of inquiry.

### III

■ The plaintiffs must establish that they were beneficiaries of Ernst & Ernst's duty of inquiry. Unlike the common law duty of inquiry whose benefaction is narrowly drawn, it would appear that the statutory duty of inquiry imposed on the defendant inured to the benefit of plaintiffs.

Section 17(a) requires the maintenance by brokers and dealers of reports and records pertaining to their financial affairs and the submission of these reports and records to the Securities and Exchange Commission. The Commission is specifically directed to prescribe those reports and records "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78q(a). The explicit thrust of this statutory section is the dominant concern evinced by the whole of the securities acts that those comprising the investing public be adequately safeguarded in their financial dealings with security brokers. Without reaching the question of whether there is implicit in section 17(a) a direct duty flowing to the plaintiffs, it is enough for purposes of proving defendant's aid and abetment of a Rule 10b–5 violation that the extant duty of inquiry imposed on Ernst & Ernst is grounded on a concern for the protection of investors such as the plaintiffs.

■ At common law the duty of inquiry owed by Ernst & Ernst would not extend to the plaintiffs. The defendant's common law duty emanates from its contract to audit First Securities. Plaintiffs were not a party to that contract or an intended third-party beneficiary. There is therefore an absence of privity between the parties, precluding action by the plaintiffs on the contract for a breach of duty. Arising out of the contractual arrangement, however, is a corollary duty of inquiry fashioned by decisional law and sounding in tort. The first significant case extending liability for negligence beyond privity of contract where, as here, only intangible economic damages were involved, was Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922).[3] In that case, the

---

2. Section 17(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78q(a), provides:

"(a) Every national securities exchange, every member thereof, every broker or dealer who transacts a business in securities through the medium of any such member, every registered securities association, and every broker or dealer registered pursuant to section 78*o* of this title, shall make, keep, and preserve for such periods, such accounts, correspondence, memoranda, papers, books, and other records, and make such reports, as the Commission by its rules and regulations may prescribe as necessary or appropriate in the public interest or for the protection of investors. Such accounts, correspondence, memoranda, papers, books, and other records shall be subject at any time or from time to time to such reasonable periodic, special, or other examinations by examiners or other representatives of the Commission as the Commission may deem necessary or appropriate in the public interest or for the protection of investors. Pursuant to this statutory section, the Securities and Exchange Commission promulgated Rule 17a–5, 17 C.F.R. § 240.17a–5.

3. In the realm of tangible, physical harm and damage to persons and property arising out

court rejected the argument that no duty was owed to the plaintiffs because there was no contract between them and defendant. Plaintiffs were purchasers of a quantity of beans. The seller contracted with the defendant, a public weigher, to certify the correct weight of the beans. The defendant knew that the plaintiffs were to use the certificates as the basis for their payment to the seller. The defendant negligently overstated the weight, and as a result the plaintiffs overpaid. In allowing the plaintiffs to recover for their economic damages, Judge Cardozo, holding that there was a duty owed to the plaintiffs, wrote:

> "We do not need to state the duty in terms of contract or of privity. Growing out of a contract, it has none the less an origin not exclusively contractual. Given the contract and the relation, the duty is imposed by law." 233 N.Y. at 239, 135 N.E. at 276.

Although the opportunity to state the duty in terms of contract was available,[4] Cardozo chose to fashion the duty in tort, observing that "the bounds of duty are enlarged by knowledge of a prospective use." 233 N.Y. at 240, 135 N.E. at 276. *Glanzer* was viewed as the precursor of a general duty of reasonable care to avoid all foreseeable risks of economic damages to third persons not in privity of contract.[5]

Nine years after the decision in *Glanzer*, Cardozo rendered his opinion in Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931). There he refused to extend the scope of liability for economic damages caused by negligence to the full limits of foreseeability in favor of a third party not in privity. In *Ultramares* the defendants, a firm of certified public accountants were negligent in their

audit of a company, Fred Stern & Co., to which the plaintiff had loaned money in reliance on the accountants' audit. The accountants did not know the exact persons to whom the certified balance sheet would be shown nor did they know that the financial statements would be submitted to the plaintiff. It was foreseeable however that Stern and Company in the ordinary course of its business would exhibit the financial statements to creditors and investors. Accordingly, it was generally foreseeable that the plaintiff would rely on the statements. Cardozo, in questioning the wisdom of a duty owed to all who might foreseeably rely on financial statements which were negligently audited, observed:

> "If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences." 255 N.Y. at 179, 174 N.E. at 444.

Declining to extend his decision in Glanzer v. Shepard, Cordozo instead distinguished *Glanzer*, stating:

> "In Glanzer v. Shepard, the seller of beans requested the defendants, public weighers, to make return of the weight and furnish the buyer with a copy. . . . Here was something more than the rendition of a service in the expectation that the one who ordered the certificate would use it thereafter in the operations of his business

---

of the negligent performance of a contract, the defense of privity of contract was effectively abrogated six years prior to the decision in *Glanzer* by Judge Cardozo's opinion in MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916).

4. Cardozo recognized that the duty could have been stated in contract. 233 N.Y. at

241, 135 N.E. at 277. In view of the specific nature of the transaction and the relationship of the parties, the third-party beneficiary rule of Lawrence v. Fox, 20 N.Y. 268 (1859), would have been apposite.

5. *See, e. g.,* Note, Privity of Contract and Tort Liability, 21 Mich.L.Rev. 200 (1922).

as occasion might require. Here was a case where the transmission of the certificate to another was not merely one possibility among many, but the 'end and aim of the transaction,' . . . In a word, the service rendered by the defendant in Glanzer v. Shepard was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the formal promisee. In the case at hand, the service was primarily for the benefit of the Stern Company . . . and only incidentally or collaterally for use of those to whom Stern and his associates might exhibit it thereafter." 255 N.Y. at 182, 174 N.E. at 445–446.

*Ultramares* set the outer limit of an accountant's common law liability for it established that there was no duty owing to all who might foreseeably rely on an accountant's negligent misrepresentation. There existed the possibility, by analogy to Glanzer v. Shepard, that an accountant owed a duty to those third persons, whose potential reliance on the financial statements was specifically known to the accountant, the so-called "foreseen plaintiff." The courts, however, have declined to accept the *Glanzer* analogy, viewing *Ultramares* as holding that accountants owe no duty to persons not in privity of contract. *See, e. g.,* O'Connor v. Ludlam, 92 F.2d 50 (2d Cir. 1937); State Street Trust Co. v. Ernst, 278 N.Y. 104, 15 N.E.2d 416 (1938); Duro Sportswear, Inc. v. Cogen, 131 N. Y.S.2d 20 (Supr.Ct.1954), aff'd without opinion, 285 App.Div. 867, 137 N.Y.S.2d 829 (1955); C. I. T. Financial Corp. v. Glover, 224 F.2d 44 (2d Cir. 1955); Candler v. Crane, Christmas & Co., [1951] 2 K.B. 164; Investment Corporation of Florida v. Buchman, 208 So.2d 291 (Fla.Ct.App. 1968). It is only in recent years that inroads have been made on the reach of the *Ultramares* decision. *See, e. g.,* R. I. Hospital Trust Nat'l Bank v. Swartz, et al., 455 F.2d 847, 851 (4th Cir. 1972); Rusch Factors, Inc. v. Levin, 284 F.Supp. 85 (D.R.I. 1968);

Ryan v. Kanne, 170 N.W.2d 395 (Iowa 1969); Shatterproof Glass Corp. v. James, 466 S.W.2d 873 (Tex.Civ.App. 1971). The courts in diminishing the impact of *Ultramares* have not only embraced the rule of *Glanzer*—liability to a foreseen plaintiff—but have extended an accountant's liability for negligence to those who, although not themselves foreseen, are members of a limited class whose reliance on the financial statements is specifically foreseen.

We agree with the defendant that there is no common law duty of inquiry owed the plaintiffs in the case at bar. Plaintiffs ground the instant action on the basis of their membership in a class of escrow claimants. It is clear that at no time did Ernst & Ernst specifically foresee that plaintiffs' limited class might suffer from the consequences of a negligent audit on its part. More important, however, is the plaintiffs' admitted lack of reliance on the financial statements and reports prepared by Ernst & Ernst and Ernst & Ernst's certificate of opinion. The common law action against a public accountant independent of an action on the contract is grounded on negligent misrepresentation; this necessarily requires direct reliance of some sort by the plaintiff on the professional services rendered by the accountant. Absent such reliance no common law duty is involved. Accordingly, we must continue our analysis only with respect to Ernst & Ernst's statutory duty of inquiry.

### IV

In determining whether Ernst & Ernst breached its statutory duty of inquiry our examination is twofold: (1) the scope of Ernst & Ernst's duty of inquiry must be ascertained; and (2) the standard of conduct by which Ernst & Ernst executed its duty must be delineated.

Going first to the last element, we are of the view that when accountants undertake to perform an audit, they are required to meet only the standard of care reasonably expected of persons

holding themselves out as skilled accountants. We agree with Judge McLean that, in general, "accountants should not be held to a standard higher than that recognized in their profession." Escott v. Barchris Construction Corp., 283 F.Supp. 643, 703 (S.D.N.Y. 1968). Accordingly, the standard of care which generally prevailed in the accounting profession during the years of Ernst & Ernst's audits of First Securities is the standard to which Ernst & Ernst must be held.

■ The extent or scope of Ernst & Ernst's statutory duty of inquiry imposed by section 17(a) and Rule 17a–5 is clearly set forth in Form X–17A–5:

"The audit shall be made in accordance with generally accepted auditing standards and shall include a review of the accounting system, the internal accounting control and procedures for safeguarding securities including appropriate tests thereof for the period since the prior examination date. It shall include all procedures necessary under the circumstances to substantiate the assets and liabilities and securities and commodities positions as of the date of the responses to the financial questionnaire and to permit the expression of an opinion by the independent public accountant as to the financial condition of the respondent at that date."

This duty to audit in accordance with generally accepted auditing standards does not differ from the duty which is otherwise imposed by law, Wessel v. Buhler, 437 F.2d 279, 283 (9th Cir. 1971); Caddell v. Goodbody & Co., CCH Fed.Sec.L.Rep. ¶ 93,938, p. 93,740 (N. D.Ala.1972); or the accounting profession itself. American Institute of Certified Public Accountants, *Audits of Brokers and Dealers in Securities* (1956).

■ Moreover, with regard to accountants' duty to uncover fraud or irregularities, we think that in general it is properly stated that:

"In making the ordinary examination, the independent auditor is aware of the possibility that fraud may exist. Financial statements may be misstated as the result of defalcations and similar irregularities, or deliberate misrepresentation by management, or both. The auditor recognizes that fraud, if sufficiently material, may affect his opinion on the financial statements, and his examination, made in accordance with generally accepted auditing standards, gives consideration to this possibility. However, the ordinary examination directed to the expression of an opinion on financial statements is not primarily or specifically designed and cannot be relied upon, to disclose defalcations and other similar irregularities, although their discovery may result. Similarly, although the discovery of deliberate misrepresentation by management is usually more closely associated with the objective of the ordinary examination, such examination cannot be relied upon to assure its discovery. The responsibility of the independent auditor for failure to detect fraud (which responsibility differs as to clients and others) arises only when such failure clearly results from failure to comply with generally accepted auditing standards." [6]

With this statement in mind, the statutory duty of inquiry was breached if it can be shown that Ernst & Ernst in failing to attain the professional standard of care did not conduct its audit of First Securities in accordance with the requirements set forth therein.

## V

We come then to the fundamental issue in this lawsuit: Whether the uncontroverted evidence reveals that Ernst & Ernst conducted its audits with all due

---

6. *Auditing Standards and Procedures*, Statements on Auditing Procedure No. 33, American Institute of Certified Public Accountants, at pp. 10–11 (1963).

care and in accordance with generally accepted auditing standards. Plaintiffs contend that Ernst & Ernest negligently failed to detect and report an alleged lack of adequate internal accounting controls of First Securities which resulted from Nay's "mail rule" and that Ernst & Ernst thereby failed to meet generally accepted auditing standards. Nay's "mail rule" was an office rule which he imposed on all employees of First Securities whereby he directed that all mail addressed to him or to the company for his attention was to be opened by no one other than him and that when he was away from the office the mail was to be placed on his desk unopened regardless of the duration of his absence from the office. Plaintiffs say that Nay's "mail rule" was the key to the concealment of his fraudulent escrow scheme and that the defendant's regulatory duty extended to investigate this practice. On the other hand, Ernst & Ernst argues that even taking into account these mail procedures its audits were conducted in accordance with generally accepted auditing standards and that First Securities maintained adequate internal accounting controls.

 It is clear that as part of Ernst & Ernst's duty to conduct its audit in accordance with generally accepted auditing standards it was incumbent on it to investigate First Securities' system of internal accounting controls. The generally accepted auditing standards as approved and adopted by the membership of the American Institute of Certified Public Accountants provide in pertinent part:

" . . .

*Standards of Field Work*

. . . . . .

2. There is to be a proper study and evaluation of the existing internal control as a basis for reliance thereon and for the determination of the resultant extent of the tests to which auditing procedures are to be restricted." [7]

Moreover, SEC Form X–17A–5, in directing that the accountant's audit be conducted in accordance with general accepted auditing standards, emphasizes that those standards shall include a review of the internal accounting control.[8] There is therefore no question but that Ernst & Ernst was under a duty to investigate the internal accounting controls of First Securities.

Ernst & Ernst says that there may be misapprehension about the function of internal accounting control. It contends that the function of internal accounting control is not to insure the detection of all irregularities, but rather to determine the extent to which an auditor can rely on the accounting records of the firm to produce a fair reflection of its financial condition and to provide reasonable assurance as to the safeguarding of assets against loss from unauthorized use or disposition.

Internal accounting controls, as defined by the American Institute of Certified Public Accountants (American Institute), comprise:

"The plan of organization and all methods and procedures that are concerned mainly with, and relate directly to, safeguarding of assets and the reliability of the financial records. They generally include such controls

7. *Auditing Standards and Procedures*, Statements on Auditing Procedure No. 33, American Institute of Certified Public Accountants, at p. 16 (1963).

8. The audit requirements of SEC Form X–17A–5 provide in relevant part:
 "The audit shall be made in accordance with generally accepted auditing standards and shall include a review of the accounting system, *the internal accounting control* and procedures for safeguarding securi-

ties including appropriate tests thereof for the period since the prior examination date. It shall include all procedures necessary under the circumstances to substantiate the assets and liabilities and securities and commodities positions as of the date of the responses to the financial questionnaire and to permit the expression of an opinion by the independent public accountant as to the financial condition of the respondent at that date." [Emphasis added].

as the systems of authorization and approval, separation of duties concerned with record keeping and accounting reports from those concerned with operations or asset custody, physical controls over assets, and internal auditing." [9]

Moreover, as noted by the American Institute: "A function of internal control, from the viewpoint of the independent auditor, is to provide assurance that errors and irregularities may be discovered with reasonable promptness, thus assuring the reliability and integrity of the financial records." [10] With respect to the prevention and detection of fraud the American Institute observes:

"6. Reliance for the prevention and detection of fraud should be placed principally upon an adequate accounting system with appropriate internal control. The well-established practice of the independent auditor of evaluating the adequacy and effectiveness of the system of internal control by testing the accounting records and related data and by relying on such evaluation for the selection and timing of his other auditing procedures has generally proved sufficient for making an adequate examination. If an objective of an independent auditor's examination were the discovery of all fraud, he would have to extend his work to a point where its cost would be prohibitive. Even then he could not give assurance that all types of fraud had been detected, or that none existed, because items such as unrecorded transactions, forgeries, and collusive fraud would not necessarily be uncovered. Accordingly, it is generally recognized that good internal control and fidelity bonds provide protection more economically and effectively." [11]

It is Ernst & Ernst's view that in light of the aforementioned purpose and func-

tion of internal accounting controls, Nay's mail rule was not relevant to the system of internal accounting control and that in any event First Securities maintained adequate internal accounting controls.

Plaintiffs meet Ernst & Ernst's contention with the affidavits of three former auditors. Fred J. Duncombe, past President of the Illinois Society of Certified Public Accountants and former Chairman of the Committee on Accountancy of the University of Illinois, stated in his affidavit: "If I had discovered in making an audit of a brokerage company that the President of the Company had established an office rule that all mail addressed to him or to the Company for his attention should not be opened by anyone but him; and that when he was away from the office for a few days, the mail addressed to him or to the Company for his attention piled up on his desk, I would not have regarded that brokerage firm as having adequate internal accounting control and would not have certified that a report based on such an audit fairly represented the financial position of the Company." To the same effect affiant Michael K. Garst, a national bank examiner of 25 years experience, indicated that under the circumstances he would have regarded Nay's "mail rule" as a possible violation of duality of control and would have appropriately commented on it. Likewise Gerhard Mayer, a certified public accountant with thirty years experience, comments in his affidavit: "If I had discovered in making an audit of a security brokerage business that its president had established an office rule that mail addressed to him at the business address, or to the company for his attention should not be opened by anyone but him, even in his absence; and that whenever he was away from the of-

9. *Auditing Standards and Procedures*, Statements on Auditing Procedure No. 33, American Institute of Certified Public Accountants, at p. 28 (1963).

10. *Auditing Standards and Procedures*, Statements on Auditing Procedure No. 33, Ameri-

can Institute of Certified Public Accountants, at p. 32 (1963).

11. *Auditing Standards and Procedures*, Statements on Auditing Procedure No. 33, American Institute of Certified Public Accountants, at p. 11 (1963).

fice such mail would remain unopened and pile up on his desk I would have to raise the question whether such rule or practice could possibly have been instituted for the purpose of preventing discovery of irregularities of whatever nature; would, as a minimum, have to undertake additional audit procedures to independently establish a negative answer to the latter question; also failing such an answer either withdraw from the engagement or decline to express an opinion on the financial statements of the enterprise."

The foregoing statements go directly to the adequacy of First Securities' system of internal accounting controls and the sufficiency of Ernst & Ernst's review of those controls. In essence they challenge Ernst & Ernst's contention that all audits of First Securities were performed in accordance with generally accepted auditing standards. That is, a negligent failure to discover a material inadequacy in internal accounting controls does not satisfy the generally accepted auditing standard that there "be a proper study and evaluation of the existing internal control." *Auditing Standards and Procedures*, Statement on Auditing Procedure No. 33, American Institute of Certified Public Accountants, at p. 16 (1963).

 We realize that there never can be attainment of a perfect or a fail-safe system of internal accounting controls. The most sophisticated system of internal control may harbor inadequacies of some nature. Accordingly, the inadequacy in internal control is of signal importance only when it enters the realm of materiality.[12] To that end we agree with the American Institute of Certified Public Accountants that:

"A material inadequacy [in internal accounting control] can be defined as a condition that would permit a person acting individually in the brokerage concern's organization to perpetrate errors or irregularities involving the accounting records, assets of the brokerage concern, and/or assets of customers that would not be detected through the internal control procedures in time to prevent material loss or misstatement of the concern's financial statements, or serious violation of rules of the regulatory agencies." [13]

On the basis of the foregoing, therefore, there are genuine issues of material fact to be properly decided by a trial: (1) whether Nay's "mail rule" constituted a material inadequacy in First Securities' system of internal accounting control; and (2) whether Ernst & Ernst failed to exercise the due care required of a professional auditor in that it did not discover a material inadequacy in internal accounting control.[14] An affirmative finding on both issues will therefore satisfy the third element of plaintiffs' claim of aiding and abetting, namely, a showing of a breach of duty of inquiry.

## VI.

Plaintiffs further contend that Ernst & Ernst was under a duty of inquiry to detect and report First Securities' noncompliance with Rule 27(c) of Article III of the Rules of Fair Practice of the National Association of Securities Deal-

12. Indeed, it is presently an express audit requirement of SEC Form X–17A–5 that the accountant comment on any *material* inadequacy in internal accounting control. The relevant portion of the audit requirements provide that:

"Based upon such audit, the accountant shall comment upon any material inadequacies found to exist in the accounting system, the internal accounting control and procedures for safeguarding securities, and shall indicate any corrective action taken or proposed. These comments may be submitted in a supplementary certificate and filed pursuant to Rule 17a–5(b)(3)."

13. Audits of Brokers and Dealers in Securities, American Institute of Certified Public Accountants, at p. 71 (1963).

14. To the extent that plaintiffs' charge regarding First Securities' vacation policy is relevant to a determination of the adequacy of internal accounting controls, they may offer evidence with respect thereto.

ers, Inc. (N.A.S.D.) [15] In Securities & Exch. Com'n v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972), we held that First Securities' enforcement of Nay's "mail rule" was sufficient without more to constitute a violation of Rule 27. Accordingly, we found First Securities, a member of the N.A.S.D., liable for Nay's fraud, due to its failure to enforce Rule 27. In Hochfelder, et al. v. Midwest Stock Exchange, 503 F.2d 364 (1974) plaintiffs raised a contention, somewhat similar to the one they raise here, that the Midwest Stock Exchange was under a duty to enforce the rules of the N.A.S.D. In response to that contention we observed (at pp. 373, 374):

> "In this action plaintiffs request that we place a duty on Midwest as a national securities exchange to enforce the rules of another self-regulatory organization, namely, the N.A.S.D., a national securities association. Without facing the question whether even the N.A.S.D. as promulgator of Rule 27 could be liable because of its member's noncompliance, plaintiffs would have us place an additional burden on Midwest to enforce the rules of another self-regulatory body. There is nothing in the 1934 Act which mandates this unique theory. Indeed, the imposition of such a burden of enforcement would be unduly onerous and result in a wasteful duplication of actions in that Midwest would be expected to enforce the rules of all self-regulatory organizations to which a member firm might belong. This would be contrary to the avowed intention of Congress and the Securities and Exchange Commission that there be more coordination and less duplica-

tion of self-regulatory activities. We hold that Midwest was under no duty to enforce Rule 27(c) of the Rules of Fair Practice of the N.A.S.D."

In the instant action the posture of plaintiffs' contention that Ernst & Ernst was under a duty to examine First Securities' compliance with the Rules of Fair Practice of the N.A.S.D. and in particular Rule 27(c) is: Public accountants are chargeable with a general duty of examining N.A.S.D. member firms for compliance with N.A.S.D. rules in view of the fact that the self-regulatory organization which promulgated the rules, the N.A.S.D., has failed to conduct examinations verifying compliance with its rules. Moreover, plaintiffs in effect claim that the duty to investigate compliance with the N.A.S.D. Rules of Fair Practice is necessarily encompassed within the body of generally accepted auditing standards. Ernst & Ernst makes the counter argument that neither SEC Rule 17a–5 Form X–17A–5, nor generally accepted auditing standards require that an auditor of a securities broker or dealer who is also a member of N.A.S.D., has any duty to review compliance by the broker or dealer with the rules of the N.A.S.D. It is claimed that such an examination for compliance with N.A.S.D. rules is entirely outside of the scope of an audit.

■ A fair reading of SEC Rule 17a–5 and Form X–17A–5 indicates that no duty is imposed on an auditor to ascertain compliance with N.A.S.D. rules. Moreover, it appears that the perceptible body of generally accepted auditing standards does not embrace such a requirement of audit review. In addition, even if plaintiffs were to be heard to

---

15. Rule 27 in pertinent part provides:

"(a) Each member [of the Association] shall establish, maintain and enforce written procedures which will enable it to supervise properly the activities of each registered representative and associated person to assure compliance with applicable securities laws, rules, regulations and statements of policy promulgated thereunder and with the rules of this Association.

"(b) Final responsibility for proper su-

pervision shall rest with the member.
. . .

"(c) Each member shall be responsible for keeping and preserving appropriate records for carrying out the member's supervisory procedures. Each member shall review and endorse in writing on an internal record, all transactions and all correspondence of its registered representatives pertaining to the solicitation or execution of any securities transaction."

complain of a contractual breach of duty by Ernst & Ernst, it is clear that Ernst & Ernst was not retained to verify First Securities' compliance with the N.A.S.D. Rules of Fair Practice.

Although plaintiffs' proposition is somewhat novel, we recognize, in agreement with the accounting profession, that it is not entirely devoid of merit. In the American Institute of Certified Public Accountants' industry audit guide on *Audits of Brokers and Dealers in Securities* the admonition is given (at p. 3):

> "In addition to a familiarity with the above rules of the Securities and Exchange Commission, it is necessary for the independent public accountant to have a working knowledge of Regulations T and U of the Board of Governors of the Federal Reserve System, and, if his client is a member of a stock exchange or the National Association of Securities Dealers, Inc., he should be familiar with the pertinent rules of those organizations. It is also considered advisable to review the applicable Accounting Series and other releases which are published from time to time by the Securities and Exchange Commission."

And, although the defendant correctly states that generally accepted auditing standards do not ordinarily require such investigation, we do not find that entirely compelling. The teaching of The T. J. Hooper, 60 F.2d 737 (2d Cir. 1932), is not lost to us for we recognize that we are not constrained to accept faulty standards of practice otherwise generally accepted in an industry or profession.[16] Moreover, the potential for imposition of liability on a broker or dealer for noncompliance with N.A.S.D. rules would seem to undermine the auditor's ability to represent that the financial statements fairly reflect the financial position[17] of the broker or dealer unless some sort of inquiry were made into compliance with those rules.

To countenance the duty of inquiry advocated by plaintiffs, however, would in our judgment be inappropriate. To direct full examination for compliance with the various rules of all the self-regulatory organizations to which a broker or dealer might belong would be to impose a burden of inquiry—otherwise not demanded by contract, statutory law, or professional practices—of indefinable proportions which arguably could never effectively and completely be implemented. We cannot subscribe to a situation whereby the accountant has the burden of an investigation which is unascertainable and everchanging.

In summary, the burden of inquiry as to compliance with N.A.S.D. rules is placed with the N.A.S.D., where it should properly repose, for it is the promulgator of those rules and as such should command adherence thereto. Ernst & Ernst, as auditor of a member firm of the N.A.S.D., need have only inquired as to whether the member firm received an adverse report following an examination by the N.A.S.D. Having

16. Judge Learned Hand aptly stated in *The T. J. Hooper* decision:

"There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. Ketterer v. Armour & Co. (C.C.A.) 247 F. 921, 931 L.R.A. 1918D, 798; Spang Chalfant & Co. v. Dimon, etc., Corp. (C.C.A.) 57 F.2d 965, 967. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission. 60 F.2d at 740.

17. Ernst & Ernst utilized a short-form auditor's report or certificate typical in style to that customarily used (and suggested by the SEC) in which Ernst & Ernst represented in an opinion paragraph that the material in the financial questionnaire filed with the Securities and Exchange Commission presented fairly the financial position of First Securities.

carried the inquiry that far, Ernst & Ernst cannot be charged with more.

## VII

■■■ If it were found after a trial that Ernst & Ernst breached its statutory duty of inquiry by failing to exercise due care in coming to the knowledge of a material inadequacy in the internal accounting controls of First Securities, it would follow that Ernst & Ernst concomitantly breached an extant duty of disclosure. As we have previously stated, a breach of Ernst & Ernst's statutory duty of inquiry is a failure on its part to adhere with generally accepted auditing standards and as such clearly would not comport with the representation it made in its audit certificates that the audits were performed in accordance with generally accepted auditing standards.[18] To prevent such a misrepresentation and to comply with the disclosure requirement of Rule 17a–5(g)(2)(B),[19] it would, at a minimum, be incumbent on Ernst & Ernst to disclose its departure from generally accepted auditing standards which of course it did not do.

■■■ More specifically, the duty, as part of generally accepted auditing standards to investigate internal accounting controls, necessarily implies that any material inadequacy in those controls will be disclosed.[20] Indeed, it is our view that a material inadequacy in internal accounting controls is a matter to which the accountant must properly take exception and to that end we note the requirements of Rule 17a–5(i) which direct that: "Any matters to which the accountant takes exception shall be clearly identified; the exception thereto shall be specifically and clearly stated. . . ." Moreover, we note that the requirement to disclose a material inadequacy in internal accounting controls, which is at least implicit in Rule 17a–5 and Form X–17A–5, was made explicit by SEC Release No. 8172. As to reports of the financial condition of security brokers and dealers filed as of November 30, 1967 or thereafter, the audit requirements of Form X–17A–5 specifically directed that:

"Based upon such audit, the accountant shall comment upon any material inadequacies found to exist in the accounting system, the internal accounting control and procedures for safeguarding securities, and shall indicate any corrective action taken or proposed. These comments may be submitted in a supplementary certifi-

---

18. In its certificate Ernst & Ernst invoked the customarily used scope paragraph whereby the representation was made that Ernst & Ernst conducted its examination of First Securities "in accordance with generally accepted auditing standards." In addition, Ernst & Ernst expressly represented that their examination "included a review of the system of internal control."

19. Rule 17a–5(g)(2)(B) provided:
 "(g) *Accountant's Certificate.*

 (2) Representations as to Audit. The accountant's certificate . . .
 (B) shall state whether the audit was made in accordance with generally accepted auditing standards applicable in the circumstances. . . ."

20. As the American Institute of Certified Public Accountants presently notes in its industry audit guide, *Audits of Brokers and Dealers in Securities*, at pp. 70–71 (1973):

"In compliance with generally accepted auditing standards, as well as the rules of the Securities and Exchange Commission and the principal national securities exchanges, the independent public accountant is required to review and make appropriate tests of the accounting system, internal accounting control, and procedure for safeguarding securities for the period since the prior examination date. If, based on his review and tests of compliance, no material inadequacies are found to exist with respect to any of the foregoing matters, the independent public accountant should so state in his report on internal control. If, however, material inadequacies are found to exist his report should disclose the nature of the inadequacies and the constructive action proposed to be taken or already taken by the brokerage concern."

cate and filed pursuant to Rule 17a–5(b)(3)."

Accordingly, under the circumstances, a finding of a breach of duty of inquiry requires a corollary finding of a breach of duty of disclosure.

## VIII

■ The last element in plaintiffs' claim for aiding and abetting a Rule 10b–5 violation is proof of a causal connection between the breach of the duty of inquiry and disclosure and the facilitation of. the underlying fraud. To that end it must be demonstrated that adequate inquiry and subsequent disclosure on Ernst & Ernst's part would have led to the discovery or prevention of Nay's fraud.

■ Ernst & Ernst contends that plaintiffs would not be able to prove at trial a causal connection. It is urged that plaintiffs' theory of causation rests on utter speculation. On the state of the limited evidence before us and without passing on the extent of the weight and probative value of that evidence, it would not appear to be entirely outside of the realm of reasonableness for the fact finder to infer that adequate inquiry by Ernst & Ernst might not of it-

self have led to the discovery or prevention of Nay's fraud.[21] Moreover, with regard to the question of whether adequate disclosure by Ernst & Ernst of a material inadequacy in internal accounting controls would have precipitated action by the SEC or self-regulatory organizations leading to the discovery or prevention of Nay's fraud, we are inclined to the view that this is a matter properly left to full evidentiary development at trial and not disposable on a motion for summary judgment.

## IX

In accordance with generally accepted auditing standards, the basic audit procedure to determine the accuracy and correctness of the books and records of a broker or dealer in securities with respect to his customers' accounts is to request and obtain written confirmation from the customers with regard to their accounts. Specifically, the audit requirements of Form X–17A–5 directed the auditor to obtain written confirmation from customers of their accounts.[22]

Pursuant to these requirements, Ernst & Ernst mailed to some of the plaintiffs confirmation forms requesting that they verify the accuracy of the details stated in the confirmation forms as to the

21. As we noted earlier, plaintiffs' affiants stated that at a minimum they would have made further investigation with respect to the mail rule to assure that it was not the vehicle for irregularity and, absent a satisfactory answer to such inquiry, would have withdrawn from the audit engagement or declined to issue an opinion on the financial position of First Securities.

22. The audit requirements of Form X–17A–5 prescribed that as of the audit date the independent public accountant was to :

"(6) Obtain written confirmations with respect to the following (see note) :

". . . .

"(f) Customers', partners', officers', directors', and respondent's accounts. Confirmation of these accounts may be in the form of a written acknowledgment of the accuracy of the statement of money balances, securities and/or commodities positions, and open contractual commitments (other than uncleared 'regular way' pur-

chases and sales of securities) accompanying the first request for confirmation mailed by the independent public accountant. Customers' accounts without balances, position or commitments, and accounts closed since the last prior audit shall be confirmed on a test basis.

". . . .

"Note: Compliance with requirements for obtaining written confirmation with respect to the above accounts shall be deemed to have been made if requests for confirmation have been mailed by the independent public accountant in an envelope bearing his own return address and second requests are similarly mailed to those not replying to the first requests, together with such auditing procedures as may be necessary; provided, however, that with respect to customers' accounts closed since the last prior audit the accountant may use either positive or negative confirmation request. . . ."

amount and composition of the customer's account. The confirmation expressly indicated that the customer was to note any differences and exceptions.[23]

23. The confirmations were sometimes prepared in the following form:

---

( )·AUDIT CONFIRMATION ( ) **EXHIBIT L**

```
┌ ┐
 ... ... ...
 ... ... ... 3 I
 ... Illinois
└ ┘
```

FOR THE PURPOSE OF ASSISTING OUR AUDITORS IN MAKING THEIR REGULAR EXAMINATION OF OUR ACCOUNTS AT THE CLOSE OF BUSINESS __October 31, 1907__ WE WOULD APPRECIATE YOUR VERIFYING THE POSITION OF THE SECURITIES AND THE BALANCE IN YOUR ACCOUNT, AS SHOWN BELOW.

VERY TRULY YOURS,

FIRST SECURITIES COMPANY OF CHICAGO

---

SECURITIES LONG

10M U.S. Treasury Bills 1/11/68

THIS CONFIRMATION REQUEST DOES NOT INCLUDE PURCHASES AND SALES OF SECURITIES, IF ANY, DURING THE FOUR BUSINESS DAYS PRECEDING THE AUDIT DATE.

THE LONG SECURITIES SHOWN HEREON, IF ANY, INCLUDE THOSE HELD IN SAFEKEEPING

CUSTOMERS' CREDIT BALANCES ARE PROPERLY ACCOUNTED FOR ON OUR BOOKS, ARE NOT SEGREGATED, MAY BE USED IN THE OPERATION OF THIS FIRM'S BUSINESS AND ARE PAYABLE UPON DEMAND.

BALANCE { DEBIT _____ CREDIT __$101.91__

---

PLEASE SIGN THIS CONFIRMATION, NOTING DIFFERENCES IF ANY, AND MAIL IT DIRECTLY TO ERNST & ERNST, 231 SOUTH LA SALLE STREET, CHICAGO, ILLINOIS, 60604, IN THE ENCLOSED ENVELOPE. YOUR PROMPT COMPLIANCE WILL BE APPRECIATED AND WILL AVOID THE NECESSITY OF FURTHER CORRESPONDENCE.

THE ABOVE STATEMENT OF MY (OUR) ACCOUNT IS CORRECT.

· SIGNED _Theresa W. Rothermel_

IMPORTANT NOTE
In the case of joint accounts, confirmations should be signed by both individuals. Confirmations signed by banks, corporations and partnerships should bear the name of the institution as well as the signature of authorized officer or partner. In the case of individuals, all confirmations should be signed by the person in whose name the account is carried. Observance of the above conditions will eliminate the necessity of further correspondence on account of incorrect signatures.

NO.

AUDIT CONFIRMATION ◯ EXHIBIT A

Helen C. Allison
5816 S. Blackstone Avenue
Chicago, Illinois 60637

FOR THE PURPOSE OF ASSISTING OUR AUDITORS IN MAKING THEIR REGULAR EXAMINATION OF OUR ACCOUNTS AT THE CLOSE OF BUSINESS_____SEP 30 1963_____ WE WOULD APPRECIATE YOUR VERIFYING THE POSITION OF THE SECURITIES AND THE BALANCE IN YOUR ACCOUNT, AS SHOWN BELOW.

VERY TRULY YOURS FIRST SECURITIES CO. OF CHICAGO
134 S. L.
CHICAGO

---

SECURITIES LONG

# NO SECURITY POSITION

THIS CONFIRMATION REQUEST DOES NOT INCLUDE PURCHASES AND SALES OF SECURITIES, IF ANY, DURING THE FOUR BUSINESS DAYS PRECEDING THE AUDIT DATE.

BALANCE { DEBIT_____-O-_____
{ CREDIT_____-O-_____

---

PLEASE SIGN THIS CONFIRMATION, NOTING DIFFERENCES IF ANY, AND MAIL IT DIRECTLY TO ERNST & ERNST, 231 SOUTH LA SALLE STREET, CHICAGO, ILLINOIS, 60604, IN THE ENCLOSED ENVELOPE. YOUR PROMPT COMPLIANCE WILL BE APPRECIATED AND WILL AVOID THE NECESSITY OF FURTHER CORRESPONDENCE.

THE ABOVE STATEMENT OF MY (OUR) ACCOUNT IS CORRECT.

SIGNED _Helen C. Allison_

IMPORTANT NOTE
In the case of joint accounts, confirmations should be signed by both individuals. Confirmations signed by banks, corporations and partnerships should bear the name of the institution as well as the signature of authorized officer or partner. In the case of individuals, all confirmations should be signed by the person in whose name the account is carried. Observance of the above conditions will eliminate the necessity of further correspondence on account of incorrect signatures.

NO. 315

2M 4-64

Often the confirmation requests were composed so as to elicit the following type of response:

EXHIBIT G

ERNST & ERNST
231 SO. LA SALLE STREET
CHICAGO 4, ILL.

No. ◯ 92

THE STATEMENT OF MY ACCOUNT WITH

FIRST SECURITIES COMPANY
OF CHICAGO
DEC 31 1961

AT THE CLOSE OF BUSINESS_____

IS CORRECT.
(SIGNED) _John M. Jackson_

IF THE ENCLOSED STATEMENT IS NOT CORRECT, KINDLY INDICATE EXCEPTIONS ON REVERSE SIDE OF THIS CARD.

In the case of joint accounts, cards should be signed by both individuals. Cards signed by banks, corporations and partnerships should bear the name of the institution as well as the signature of authorized officer or partner. In the case of individuals, all cards should be signed by the person in whose name the account is carried. Observance of the above conditions will eliminate the necessity of further correspondence on account of incorrect signatures.

Admittedly, no confirmation of account sent by Ernst & Ernst to the plaintiffs at any time listed or referred to plaintiffs' escrow accounts. It is equally clear, however, that no plaintiff who received a confirmation request from Ernst & Ernst took exception to the failure of the confirmation to list his escrow account. On the basis of plaintiffs' failure to take exception to the confirmation requests, the trial judge held that they were estopped as a matter of law from pursuing their claims against Ernst & Ernst. The judge observed:

> "Plaintiffs raise no factual issue that they failed to correct defendant's confirmation slips on their First Securities accounts, and it was only with respect to auditing First Securities Co. that defendant Ernst & Ernst had any responsibility. Therefore in the only direct dealings which plaintiffs had with this defendant, they misled defendant to its detriment in a very material respect. Had they not done so, we might infer that Ernst & Ernst would have been put on notice sufficiently to investigate further and perhaps perfect its audit, but its failure to do so was caused in part by the plaintiffs, for aught that appears in the record."

■■■ Estoppel is properly asserted as an affirmative defense to a claim of aiding and abetting a Rule 10b–5 violation. See generally, Straley v. Universal Uranium and Milling Corp., 289 F.2d 370 (9th Cir. 1961); Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 213–214 (9th Cir. 1962); Dale v. Rosenfeld, 229 F.2d 855, 859 (2d Cir. 1956). It is a rule of fundamental fairness whereby a party is precluded from benefiting from his own inconsistent conduct which has induced reliance to the detriment of another. That is, where a plaintiff has,

with knowledge of the facts, initially conducted himself in a particular fashion, he cannot thereafter assume a posture inconsistent with such conduct to the detriment of a defendant who has acted in material reliance upon that conduct. See, e. g., Hecht v. Harris, Upham & Co., 430 F.2d 1202, 1208 (9th Cir. 1970); Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212–214 (9th Cir. 1962); Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104 (9th Cir. 1960). Applying the estoppel rule to the instant case, if plaintiffs knew they were to report the escrow accounts as an exception on the confirmation and failed to do so, they ought not be heard to complain of Ernst & Ernst's failure to uncover or prevent the fraudulent escrow scheme, for the inference is strong that disclosure by plaintiffs to Ernst & Ernst of the existence of the escrow accounts would have led to the discovery of Nay's fraudulent scheme. Whether plaintiffs knew or as reasonable persons should have known that they were to report the escrow accounts as exceptions on the confirmation requests is a question to be properly decided by the fact finder. We cannot say as a matter of law that a reasonable investor of similar business sophistication and intelligence as plaintiffs would have reached no other conclusion but that disclosure of the escrow account was called for by the confirmation request. Nor can we conclude that a reasonable investor viewing the express language of the confirmation would have limited his verification to the amounts stated and noted no exceptions for the escrow account.[24]

## X

The trial judge held that the applicable three year statute of limitations had run in view of the fact that Ernst & Ernst's last audit was filed in December,

---

24. As to those plaintiffs to whom Ernst & Ernst sent no confirmations we find the estoppel argument to be unavailing. It cannot be said that Ernst & Ernst relied on any direct action or express representation by such plaintiffs. Nor can Ernst & Ernst ground its estoppel defense on any alleged representation emanating from transaction confirmations sent to plaintiffs by First Securities and not sent by Ernst & Ernst in the course of its audit.

1967 and the first complaint in plaintiffs' actions was not entered until February, 1971. In the district court plaintiffs urged that the equitable tolling doctrine prevented the bar of the statute of limitations from beginning to run until Nay's fraud was discovered shortly after his suicide in June, 1968, and, on that basis, it can be stated that plaintiffs' position refutes any claim that their actions were untimely filed. The trial judge rejected the plaintiffs' effort to invoke the equitable tolling doctrine, holding that "the cause of action was not fraudulently concealed by this defendant." Assuming the applicability of the tolling doctrine, the judge went on to note that the plaintiffs could not demonstrate due care on their part in light of their failure to come to the knowledge of the wrong of which they complained.

We have addressed this same issue in the companion case to the instant action, Hochfelder, et al. and Martin, et al. v. Midwest Stock Exchange, 364 F.2d 503 (1974). In that decision we observed that the "equitable tolling doctrine provides that where a fraud which is the foundation of the suit has actively been concealed or is of such a nature as to conceal itself, the statute of limitations is tolled until the plaintiff has obtained knowledge of the fraud or in the exercise of due care should have obtained knowledge of the fraud. Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874); Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1945); Morgan v. Koch, 419 F.2d 993, 997 (7th Cir. 1969)." We went on to note that the thrust of plaintiffs' action against the Midwest Stock Exchange, as here against Ernst & Ernst, was grounded in negligence and not on any contention that the defendant was chargeable with acts of fraud or fraudulent concealment. In rejecting the defendant's assertion that the tolling doctrine did not embrace the plaintiffs' action we stated:

". . . However, we do not believe that the tolling doctrine should be so narrowly drawn that it does not encompass Midwest's alleged acts of facilitation of the fraud.

"It is charged that Midwest's conduct amounted to negligence and that its negligence facilitated or provided the means for Nay's fraud. Nay effectively concealed his fraud and as a result the alleged implementing negligence of Midwest was concealed and brought to the surface only when the facts surrounding Nay's fraud were first discovered. If claims brought in the same posture as the instant action —asserting charges amounting to negligence but short of fraud—are to have any vitality, it cannot be contended that the tolling doctrine should not apply. Often the underlying fraud, carefully concealed in and of itself, would cloak the implementing actions of others. Accordingly, where the acts of a defendant facilitate the perpetration of a concealed fraud of another, the bar of the statute of limitations should not begin to run until a plaintiff obtains knowledge or through due diligence should have obtained knowledge of the underlying fraud."

This observation is applicable in the instant action for Ernst & Ernst is charged with the negligent facilitation and implementation of Nay's fraud. Moreover, Nay through his efforts in concealing the underlying fraud effectively cloaked and concealed the alleged negligent facilitating conduct of Ernst & Ernst. In our judgment plaintiffs may avail themselves of the equitable tolling doctrine and the bar of the statute of limitations does not begin to run until it can otherwise be established that they knew or in the exercise of due diligence should have known of Nay's fraud. Whether plaintiffs knew or in the exercise of due diligence should have known of Nay's fraud is, on the basis of the evidence before us, an issue properly to be decided at a trial.

The judgment of the district court is reversed and the case is remanded for trial under the provisions of Circuit Rule 23.